IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

AL JEFFERSON DAVIS and
BRITTANY DAVIS,

    Plaintiffs,

v.                              CASE NO. 5:12-cv-178-RS-EMT

HABITAT FOR HUMANITY
OF BAY COUNTY, INC.,

    Defendant.
_____/

## ORDER

Before me are Defendant's Motion for Summary Final Judgment (Doc. 52), Statement of Material Facts not in Dispute (Doc. 53), and Memorandum of Law (Doc. 54), Plaintiffs' Amended Response (Doc. 69) and Plaintiffs' Amended Statement of Facts that are Disputed (Doc. 70), as well as voluminous evidentiary material.

## Standard of Review

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S. Ct. 2505, 2512 (1986). The moving party has the burden of showing the absence of a genuine issue as to

Page 2 of 15

any material fact, and in deciding whether the movant has met this burden, the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). Thus, if reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment. *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Trust v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985)). However, a mere 'scintilla' of evidence supporting the nonmoving party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party. *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 251).

## Background

Defendant Habitat for Humanity ("Habitat") is a non-profit organization which builds simple and affordable housing for low-income families. Applicants are considered if their present housing is not adequate and they are unable to obtain adequate housing through conventional means. From the pool of applicants, Habitat selects "partner families" to become homeowners. Members of the partner families must perform a certain number of sweat equity hours building their own home and other Habitat homes. Completed homes are sold to the partner families

at cost and financed with zero-interest loans. Every Habitat mortgage requires that mortgagor "[t]o occupy the mortgaged property on a full time basis and to permit no rental or tenant occupancy thereof without the express written consent of [Habitat]."

Plaintiffs in this action are siblings. Al Davis is an able-bodied 38 year old and Brittany Davis is a 35 year old hemiplegic who, as the result of a car accident, is confined to a wheelchair and requires 24-hour care that is provided by either her family or a caregiver. The Davises live with their mother, Kathy Caine, and step-father and have done so for all of the time at issue in this case. In September of 2004, the Davises filed a joint application for a Habitat home. They represented to Habitat that they had a need for housing because their mother was going to convert their home into a bed and breakfast, which would displace them. Their joint application was approved on May 19, 2005. Between May 2005 and June 2006 the Davises completed the required number of sweat equity hours to be eligible for Habitat ownership. Brittany Davis completed her hours by helping to distribute food and drinks to volunteers at build sites and by serving as a Salvation Army bell-ringer during the Christmas season.

The home that was intended for the Davises is located at 326 Center Avenue, Panama City, Florida, 32401. The Development Order for the home was issued on February 21, 2006. Although the Habitat guidelines provide that a

family of two should receive a two-bedroom, one-bathroom home, a three-bedroom, one-bathroom was planned for the Davises to accommodate Brittany Davis's medical equipment and provide sleeping quarters for her caregiver. The Davises had wanted 1 ½ bathrooms because Brittany Davis's disability caused her to require extensive time in the bathroom, but Habitat decided to include only the single bathroom because that was the standard in a Habitat home for a family of two. Habitat contacted Habitat International for guidance on building a handicapped-accessible home, and employed J. Michael Hunnicut to draw the architectural plans for Plaintiffs' house. The parties determined that they would modify an existing floor plan to use for Plaintiffs' home. Mr. Hunnicut created a wheelchair-accessible floor plan, but the plans were not drawn specifically for Brittany, and Mr. Hunnicut did not meet with Plaintiffs before drafting the plans.

Ms. Caine, who has a bachelor's degree in interior design and had taught interior design at a technical college, also created a set of plans for the home, but these plans were not used by Habitat. Plans of Kathy Caine, Doc. 58-3.

Prior to construction, a representative from Habitat met with the Davises and their mother to discuss Brittany's needs. The Davises also met with Mr. Gary Sherman, a rehabilitation engineer, to make suggestions about how to make the home most accessible to Brittany. In December of 2005, Sherman met with the Davises, Ms. Caine, and several Habitat representatives to discuss Brittany's

specific needs. Mr. Hunnicut was not present, and his plans were not drafted with any input from Mr. Sherman, Plaintiffs, or Ms. Caine. Following the meeting, Habitat agreed to modify the floor plan in the following ways:

   a. No linen closet would be located in the bathroom.
   b. The bathroom would be covered in 4"x4" ceramic tile.
   c. The floor tiles in the bathroom would be textured.
   d. A handicap accessible sink, with offset drawers or a cabinet, would be installed in the bathroom.
   e. The toilet and sink positions would be switched.
   f. The shower area would have a 1/4" per foot slope.
   g. Plastic laminate would be installed on the back of the bathroom door.
   h. Two grab bars would be installed near the toilet.
   i. Two grab bars would be installed in the shower.
   j. The sink and cabinets in the kitchen would be installed 32" high.
   k. The kitchen would be made accessible from two sides.
   l. The kitchen would be made as wide as possible.
   m. Commercial carpet would be installed throughout the house.
   n. The driveway would be moved so that an accessible entryway to the house would be at the side door.[1]
   o. The doorways would be 36" wide.
   p. The electrical outlets would be installed at a height Brittany Davis could reach.

The foundation for the Davises' home was poured in early 2006 and Ms. Caine immediately noticed some problems, mostly involving the layout of the bathroom and the location of the plumbing lines because the toilet would be too close to the wall if the layout wasn't corrected. Aff. of Kathy Caine in Opposition

---

[1] The memorandum memorializing the agreement says "Driveway- to the side door." Agreement for Modifications to HFHBC's 1000 sq. ft. three bedroom floor plan made for the Davis Family on December 9, 2005, Doc. 55-20. The front door was not made accessible to Brittany and the parties vigorously dispute whether that was agreed upon.

to Motion for Summary Judgment ("Caine Aff.") ¶ 9, Doc. 62-1. Ms. Caine spoke to the construction supervisor around April of 2006 and expressed concern that the front porch and door would not be accessible to Brittany and was told that the problem could easily be fixed with some concrete and further assured Ms. Caine that the parking area would be covered. *Id.* at ¶ 11. However, neither of those tasks were ever accomplished. Little construction activity occurred during the next year.

In March of 2007, a woman who represented herself as Brittany's caregiver went to the Habitat office and told Habitat representatives that the Davises should not be allowed to purchase a Habitat house because they were not planning to live there.[2] On May 17, 2007, Habitat sent a letter to the Davises requesting them to execute a "homeownership affidavit," which stated,

> I understand that under the terms of the first and second mortgages that I will be signing with HFHBC, I must use the house as my home and I will not be allowed to rent the house to anyone else or allow anyone else other than a direct family member to live in the house, and, upon violation of these terms in the mortgage I could be found in default of the terms of the mortgages and face foreclosure.

Plaintiffs' mother advised Habitat by letter on May 30, 2007, that the language of the affidavit was unacceptable because Brittany may need a caregiver to reside in

---

[2] Plaintiffs contend that this fact is in dispute because they have no knowledge that anybody ever presented such concerns to Habitat. Affidavit [of Kathy Caine] ¶ 4, Doc. 68-13 ("My family and I never had the intention to rent out the home built by Defendant for Brittany nor am I acquainted with the person who allegedly informed the Defendant otherwise."). However, there is nothing in the record to controvert that the event actually happened.

the home which would violate the terms of the affidavit as written. Thus, on August 1, 2007, Habitat provide a revised affidavit to the Davises which read,

> I understand that under the terms of the first and second mortgages that I will be signing with HFHBC that: I intend to occupy the mortgaged property on a full time basis and to permit no rental or tenant occupancy thereof without the express written consent of Mortgagee (HFHBC). Upon violation of these terms in the mortgage I could be found in default of the terms of the mortgages and face foreclosure.

No other partner family was required to execute a homeownership affidavit, but the revised language was identical to the language contained in every Habitat mortgage. Habitat ultimately abandoned its request that Plaintiffs execute the homeownership affidavit and did not condition the purchase of the home on its execution, but Al Davis and his mother claim that they never received notice that the requirement had been abandoned.

Substantial work had been done on the home by August of 2007, and Plaintiffs were dissatisfied with the construction. Plaintiffs' counsel sent a letter to Habitat pointing out that Plaintiffs had conceded to accept the one bathroom handicapped accessible floor plan approved by Habitat International rather than the 1 ½ bathroom floor plan they had originally requested as long as modifications were made to allow Plaintiffs to better use the space. Counsel pointed several problems that needed to be fixed: (i) the floor of the bathroom was not sloped enough for quick drainage; (ii) the toilet was installed too close to the wall; (iii) the

front door had a four-inch step which prevented Brittany from entering the home through the front door in her wheelchair; (iv) the concrete ramp from the driveway into the side door did not have railings; and (v) there was no awning over the ramp. Counsel requested that Habitat "[m]odify the home to make it ADA accessible to Brittany as originally requested at no additional cost within 60 days." Letter from Cecile M. Scoon, Counsel for Davises, to Mary C. Mayhill, Executive Director, Habitat for Humanity of Bay County (Aug. 8, 2007), Doc. 55-28.

In October of 2007 the home was substantially complete, and Plaintiffs conducted a walk-through to identify items which needed repairs or alterations. Habitat provided Plaintiffs with a "punch list" that it used for that purpose, but the punch list was not completed. As of December 6, 2007, Habitat had not received any requests for changes from Plaintiffs. Memorandum Dated December 6, 2007, Doc. 55-30. However, at some later date Plaintiffs compiled an exhaustive list of issues with the house which included photographs, drawings, and diagrams of the problem areas and requests for changes. Packet Titled "Brittany Davis' First Time to Enter the Habitat House Located at 326 Center Avenue," Doc. 58-4. The following issues were identified:

   a. The concrete parking pad was too small.
   b. The concrete ramp leading to the side entry door of the home did not have a handrail.
   c. The ramp was not covered.
   d. The doorknob to the side entry door of the home was difficult for Brittany Davis to operate; she required a lever-style doorknob.

      e. Entering the home through the laundry room posed a safety risk if there were laundry baskets on the floor.
      f. The laundry room was not functional for Brittany.
      g. The hallways were too narrow for Brittany to turn her wheelchair around.[3]
      h. The front entryway was not accessible to Brittany.
      i. The bathroom was too small.
      j. The countertops in the kitchen were not rounded correctly.
      k. A dishwasher was not provided.

The requested changes also included installation an exhaust fan with a heater in the bathroom. Plaintiffs were told that they would have to pay for any of these changes to be made. Caine Aff. ¶ 14, Doc. 62-1. However, Plaintiffs were unwilling to pay for the changes because they felt that the house should have been constructed with these attributes initially, as they had repeatedly requested that the home be designed as user-friendly as possible for Brittany. Caine Aff. ¶ 15, Doc. 62-1. Habitat admits that the toilet was placed too close to the wall in the bathroom and ultimately corrected that issue at its own expense.[4]

---

[3] Brittany sits in her wheelchair with one of her legs extended at all times, which results in a turning radius of roughly a foot more than if she were sitting normally in a wheelchair with both legs angled down. Caine Aff. ¶ 2, Doc. 62-1. Prior to construction, Ms. Caine requested that the hallway be constructed wider so Brittany could turn around. *Id.* Habitat acknowledges that the hallway was not constructed wide enough for Brittany to turn around, but contends this is because the building plans did not call for the hallway to be constructed so wide. Dep. of Cornel Brock, Dec. 14, 2012, 64:11-65:11, Doc. 55-29. According to a Habitat representative, the hallway was actually built 2 ½ inches wider than the plans called for, which is what caused the problem with the toilet placement. *Id.* Mr. Hunnicut, the architect, drew the plans for someone in a wheelchair but was not informed of Brittany's specific situation.

[4] Although the problem was eventually fixed, Ms. Caine pointed it out immediately after the foundation was poured and more than a year before the toilet was placed. Caine Aff. ¶¶ 9, 13, Doc. 62-1. At the construction site, she was told that once the foundation was poured, it was too late to change the toilet's location because short of using a jackhammer to remove the foundation, it was permanent. Caine Aff. ¶ 9, Doc. 62-1. Habitat did have to jackhammer the entire bathroom floor to fix the problem. Caine Aff. ¶ 21, Doc. 62-1; Dep. of Cornel Brock, Feb. 6, 2013, 65:12-65:14, Doc. 60-6. Had her concern been addressed earlier, it would have been much easier to correct the misplaced toilet.

A Certificate of Occupancy was issued for the house on May 8, 2008. However, Plaintiffs and Habitat were never able to come to an agreement that Plaintiffs would purchase the home. Habitat offered to build another home for Plaintiffs on one of several different lots, but Plaintiffs declined this offer because none of the alternative locations were suitable for Brittany. On January 22, 2009, Habitat "de-selected" Plaintiffs as potential Habitat homeowners. The home was eventually purchased by a different partner family.

On June 17, 2011, Plaintiffs filed their initial complaint in state court alleging discrimination pursuant to the federal Fair Housing Act. Habitat subsequently removed the case to this Court, and we are now operating under the Second Amended Complaint (Doc. 1). Count I alleges violation of Florida's Fair Housing Act ("FHA"), codified at Florida Statute § 760 and Count II alleges violation of the federal FHA, 42 U.S.C. §§ 3601-3604. Habitat now seeks summary judgment.

## Analysis

The Fair Housing Act prohibits discriminatory housing practices based on an individual's disability or handicap. 42 U.S.C. § 3604(f)(1)(A). ("[I]t shall be unlawful . . . [t]o discriminate in the sale rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of that buyer or renter . . . ."). Discrimination includes "a refusal to make reasonable

accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

Because Habitat does not donate houses to partner families, but rather sells them to the families at cost and provides an interest-free mortgage for that amount, there would be no monetary loss to Defendant for accommodating requests for upgrades and modifications to homes during construction. However, Habitat's current Executive Director is concerned that building some homes more lavishly than the standard would create a new standard which is beyond what it would actually be able to provide to future partner families. Dep. of Cornel Brock, Feb. 6, 2013, 85:5-85:9, Doc. 55-17. Plaintiffs argue that this "policy" of not permitting homes to be customized caused Habitat not to provide equal access to disabled applicants. This is Plaintiffs' primary argument.

When the Fair Housing Amendments Act of 1988 was enacted, the Office of the Secretary for Fair Housing and Equal Opportunity addressed specific concerns expressed by the public. Regarding discrimination by refusing to make reasonable accommodations in rules, policies, practices, or services if necessary to afford a person with handicaps equal opportunity to use and enjoy a dwelling, the Secretary stated,

> A number of commenters were concerned that this language could be interpreted as requiring that housing providers provide a broad range

of services to persons with handicaps that the housing provider does not normally provide as part of its housing. The Department wishes to stress that a housing provider is not required to provide supportive services, e.g., counseling, medical, or social services that fall outside the scope of the services that the housing provider offers to residents. **A housing provider is required to make modifications in order to enable a qualified applicant with handicaps to live in the housing, but is not required to offer housing of a fundamentally different nature. The test is whether, with appropriate modifications, the applicant can live in the housing that the housing provider offers; not whether the applicant could benefit from some other type of housing that the housing provider does not offer.**

Implementation of the Fair Housing Amendments Act of 1988, 54 Fed. Reg. 3232, 3249 (Jan. 23, 1989) (emphasis added). All parties agree that Habitat is not in the business of building custom homes, but rather builds simple, decent homes for families in need.

Plaintiffs argue that building simple homes that do not address partner families' specific desires or needs works well with able-bodied applicants, but is per se discriminatory toward disabled applicants who require specific changes to cookie-cutter homes to accommodate their disabilities. I agree that if Habitat refused to build handicapped-accessible homes for partner families with handicapped family members or refused to select such families as partner families at all, this would likely be a violation of the FHA. However, that is not what happened in this case. Habitat made extensive changes to the house to accommodate Brittany's disabilities. Plaintiffs were permitted to use a three-

bedroom floor plan even though families of two usually receive two-bedroom homes; an architect modified a floor plan to make it wheelchair-accessible, although not customized for Brittany's specific wheelchair; a custom-designed handicapped-accessible bathroom was built, although Plaintiffs contend that it was much too small for Brittany to use; cabinet and outlet heights were customized for Brittany; the doorways were widened to 36 inches; and a ramp connected the parking slab to the side entrance of the house.

Plaintiffs acknowledge that Habitat did make some accommodations, but not enough for the home to be suitable for Brittany's basic needs. They assert that Ms. Caine made it abundantly clear to Habitat prior to construction that Brittany required extensive accommodations but that Habitat haphazardly chose which accommodations to include without consulting Plaintiffs. It is clear that there were several breakdowns in communication between Plaintiffs and Habitat throughout the construction and that Habitat representatives may have become irritated with the many requests for changes made by Plaintiffs' mother. Ms. Caine testified that her communications with Habitat's executive director became heated and adversarial. Caine Aff. ¶ 13, Doc. 62-1. Ms. Caine submitted numerous articles to Habitat which described accommodations that could be incorporated to homes during construction and performed extensive research about how to make the home safe and accessible for Brittany. Caine Aff. ¶¶ 16 & 18, Doc. 62-1. Habitat was

evidently not interested in hearing these suggestions. Further, at least one of the requested modifications that was not made was the result of miscommunications. Specifically, Ms. Caine had requested that a countertop be rounded at the edges to prevent Brittany's arm from being scraped on a sharp corner, but the Habitat representative misunderstood the request and instead the wood brace supporting the counter was rounded. It is also clear in this case that there are many facts in dispute. For example, Plaintiffs and Habitat disagree about how it came to be that Brittany's entryway into the house became the side door near the parking slab rather than the front door.[5] Also, Plaintiffs claim that they were unaware that Habitat lifted the requirement that Plaintiffs sign a homeownership affidavit, while Habitat maintains that Plaintiffs, or at least Plaintiffs' mother, was aware that the requirement had been lifted. However, only disputes of *material* facts prevent the entry of summary judgment.

The fact that the parties became frustrated with each other and experienced communication breakdowns does not mean that Habitat violated the FHA. Under the FHA, Habitat was required to alter its policies so that the home being built for Plaintiffs could be used and enjoyed by Brittany to the same extent that a Habitat home could be used and enjoyed by any other partner family. To the extent that

---

[5] Habitat contends that Mr. Sherman suggested that the entry point for Brittany Davis should be the laundry area because it was the quickest point of entry. Dep. Of Mary Kennedy, Dec. 14, 2012, 22:22-23:2; 83:11-24, Doc. 55-7. Plaintiffs contend that Mr. Sherman never suggested that the entryway should be on the side of the house. Caine Aff. ¶ 19, Doc. 62-1.

Habitat had a "policy" of not building custom homes, it certainly altered this policy by building a specially-designed, custom home for Plaintiffs. I find that as a matter of law, the accommodations made to Plaintiffs were sufficient to be non-discriminatory under the FHA. Habitat did not incorporate every single change requested by Plaintiffs. The law does not require it to do so.

## Conclusion

The practical effect of denying summary judgment and allowing this case to proceed to a jury would be to require Habitat for Humanity to incorporate every request for modifications into homes built for partner families with disabled members. That is clearly not what the FHA envisions or requires. Accordingly, Defendant's Motion for Summary Final Judgment is **GRANTED**. The Clerk is directed to close the case.

**ORDERED** on April 26, 2013.

/s/ Richard Smoak
**RICHARD SMOAK**
**UNITED STATES DISTRICT JUDGE**